Slip Op. 07-170

## UNITED STATES COURT OF INTERNATIONAL TRADE

HUVIS CORPORATION,

        *Plaintiff,*

v.

UNITED STATES,

        *Defendant,*

and

DAK FIBERS, LLC and WELLMAN, INC.,

        *Defendants-Intervenor.*

BEFORE: GREGORY W. CARMAN, JUDGE

Court No. 06-00380

[*Plaintiff's USCIT R. 56.1 Motion for Judgment upon the Agency Record is GRANTED; Plaintiff's Motion for Oral Argument is DENIED.*]

*McDermott Will & Emery LLC* (*Raymond Paretzky* and *Michael P. House*) for Plaintiff.

*Peter D. Keisler,* Assistant Attorney General; *Jeanne E. Davidson*, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Stephen C. Tosini*) for Defendant.

*Mark D. Lehnardt*, of Counsel, Office of the Chief Counsel for Import Administration, United States Department of Commerce, for Defendant.

*Kelley Drye Collier Shannon* (*David C. Smith, Jr.* and *Paul C. Rosenthal*) for Defendants-Intervenor.

November 20, 2007

## OPINION & ORDER

CARMAN, JUDGE: The motion before this Court is Plaintiff Huvis Corporation's

("Huvis") USCIT R. 56.1 Motion for Judgment upon the Agency Record. Huvis

challenges the final results of the fifth administrative review of the antidumping duty

order on certain polyester staple fiber from Korea. *Certain Polyester Staple Fiber from*

*Korea*, 71 Fed. Reg. 58,581 (Dep't Commerce Oct. 4, 2006) (final results) and the

accompanying Issues and Decision Memorandum (Dep't Commerce Sept. 28, 2006),

Pub. Doc. 80 ("5AR Issues and Decision Mem.") (collectively, "Final Results"). For the

reasons that follow, this Court remands the Final Results to the United States

Department of Commerce ("Commerce") for further action consistent with this opinion.

## BACKGROUND

Huvis is a Korean producer and exporter of polyester staple fiber ("PSF"), a

synthetic fiber chiefly used for stuffing items such as clothing and pillows. *See Certain*

*PSF from Korea*, 71 Fed. Reg. at 58,581. PSF is subject to an antidumping duty order, and

Huvis has participated in many administrative reviews in connection therewith. The

administrative review that is the subject of this action, the fifth, covered the period May

1, 2004, through April 30, 2005. *Id.*

PSF is made from chemical raw materials, the most important of which is

terepthalic acid.  Huvis uses three types (or grades) of terepthalic acid in its

manufacture of PSF: qualified-grade terepthalic acid ("QTA"), middle terepthalic acid

("MTA"), and purified terepthalic acid ("PTA").  During the period of review, Huvis

purchased all of the terepthalic acid it used from affiliated companies.  Huvis purchased

MTA from one of its two parent companies, SK Chemicals, while it purchased QTA and

PTA from Samnam Petrochemical Company, Ltd. ("Samnam").[1]  (Br. of Pl. Huvis Corp.

in Supp. of Pl.'s Mot. for J. upon the Agency R. ("Pl. Br.") 3-4 (*citing* Confidential Record

("Confid. R.") Doc. 3 at App. D-4 at 1); *see also* Confid. R. Doc. 7 at 30.)

During the fifth administrative review, Commerce requested that Huvis submit

three values for the purchases of terepthalic acid made during the period of review:

(1) the price Huvis paid to its affiliated suppliers (the "transfer price"); (2) the affiliated

producer's cost of production for the input; and (3) the price at which the affiliated

producer made sales of the input to unaffiliated parties (the "market price").  For MTA,

Huvis submitted all three of the requested measures: transfer price, cost of production,

and market price.  (Pl. Br. 4-5.)  In contrast, for the inputs QTA and PTA, Huvis

submitted only transfer price and cost of production, but not market price.  (*Id.* at 4.)

---

[1]Samnam is 40 percent owned by Huvis's other parent company, Samyang, but is
60 percent owned by two companies unaffiliated with Huvis—Mitsubishi Chemicals
Company (40 percent) and LG-Caltex Oil Company (20 percent).

Huvis explained that its supplier of the QTA and PTA, Samnam, was not willing to

provide market price data to Huvis because Samnam considered it proprietary.

Further, Huvis explained to Commerce that it could not force Samnam to supply the

market price data because neither Huvis nor its parent company, Samyang, exercised

control over Samnam.  As for the two measures that Huvis did submit, the data showed

that the average transfer price was higher than Samnam's cost of production for both

QTA and PTA.  (*Id.* at 6-7 (*citing* Confid. R. Doc. 7 at 31).)

In the preliminary results, Commerce calculated Huvis's cost of manufacture for

PSF by adding together, *inter alia*, the values of the chemical inputs to that

merchandise—QTA, MTA, and PTA.  Because Huvis bought QTA, MTA, and PTA from

affiliated suppliers, and because they constituted "major inputs" to PSF, Commerce

applied the "Major Input Rule" to determine their values.[2]  For the input MTA,

Commerce compared the transfer price, market price, and cost of production.  Because

the transfer price was higher than both market price and cost of production, Commerce

made no adjustments to the value of MTA.  For the input PTA, market price was not on

---

[2]When a respondent purchases a major input from an affiliated party, Commerce
applies the Major Input Rule to determine whether the input was purchased at arm's-
length.  19 U.S.C. § 1677b(f)(2) and(3) (2000).  Commerce has interpreted the Major
Input Rule to allow the agency to "determine the value of a major input purchased from
an affiliated person based on the higher [*sic*] of" (1) transfer price, (2) market price, and
(3) cost of production, 19 C.F.R. § 351.407(b) (2005), and the Court of Appeals for the
Federal Circuit ("CAFC") has sustained this interpretation, *NTN Bearing Corp. of Am. v.
United States*, 368 F.3d 1369, 1376 (Fed. Cir. 2004).

the record, and so Commerce compared only transfer price and cost of production.

Because transfer price was higher, Commerce made no adjustment to the value of PTA.

For the input QTA, Commerce followed the methodology it had used for that input in

the previous administrative review. *Certain PSF from Korea*, 71 Fed. Reg. 30,867, 30,871

(Dep't Commerce May 31, 2006) (preliminary review results). After finding that QTA

was "interchangeable" with MTA, Commerce filled in the missing QTA market price

with the MTA market price Huvis had submitted. Because the MTA market price was

higher than the QTA transfer price and cost of production, Commerce upwardly

adjusted the value of QTA to reflect the arm's-length, or market, price.

Following Commerce's publication of the preliminary results, Huvis submitted

information to Commerce that MTA and QTA were not, in fact, interchangeable.

Commerce reevaluated its preliminary findings and agreed with Huvis that the two

inputs were not interchangeable. Commerce also reevaluated its position regarding the

missing market price for the input PTA. In the final results, Commerce applied facts

available[3] to fill in market prices for both QTA and PTA. To fill in the missing market

prices, Commerce calculated a profit rate taken from the supplier's, Samnam's,

submitted financial statements. (5AR Issues and Decision Mem., Comment 1, Pub. Doc.

---

[3]Section 1677e of title 19, U.S. Code, addresses situations where information is missing from the record. "If . . . necessary information is not available on the record," Commerce shall "use the facts otherwise available in reaching the applicable determination under this subtitle." 19 U.S.C. § 1677e(a) (2000); *see also infra*, Section I.

80.)  Commerce added that profit rate to Samnam's cost of production data for QTA and

PTA to come up with a calculated market value for each input.  Because the calculated

market prices were higher than the transfer prices (and, obviously, than the costs of

production, as the market value was derived from the cost of production), Commerce

upwardly adjusted the QTA and PTA values when calculating the cost of manufacture

for Huvis's PSF.  (*Id.*)  Huvis argues that this had the effect of unfairly increasing the

dumping margin applied to its imports.  After Commerce published notice of the Final

Results in the Federal Register, Huvis timely filed suit in this Court.

## JURISDICTION

This Court has exclusive jurisdiction to review final results of administrative

reviews pursuant to 28 U.S.C. § 1581(c) (2000).

## STANDARD OF REVIEW

When reviewing Commerce's final results of administrative reviews, this Court

must sustain Commerce's determinations, findings, or conclusions unless they are

"unsupported by substantial evidence on the record, or otherwise not in accordance

with law."  19 U.S.C. § 1516a(b)(1)(B)(i) (2000); *accord NTN Bearing Corp. of Am. v. United*

*States*, 368 F.3d 1369, 1372 (Fed. Cir. 2004); *Micron Tech., Inc. v. United States*, 117 F.3d

1386, 1393 (Fed. Cir. 1997).  To be in accordance with law, an agency's action or decision

must be constitutional, and not contrary to statute, regulation, precedent, or procedures.

*FCC v. NextWave Pers. Commc'ns, Inc.*, 537 U.S. 293, 300 (2003) (*citing Citizens to Preserve*

*Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413-14 (1971) ("In all cases agency action must

be set aside if the action . . . failed to meet statutory, procedural, or constitutional

requirements.").

## DISCUSSION

Huvis challenges Commerce's application of facts available evidence to fill in the

missing market prices for the inputs QTA and PTA.  Huvis claims that Commerce's use

of facts available evidence was not supported by substantial evidence on the record or

otherwise in accordance with law for three reasons.  Huvis claims that Commerce's use

of facts available, first, violated 19 U.S.C. § 1677m(e), and second, was inconsistent with

Commerce's established practice in the context of the Major Input Rule.  (Pl. Br. 11-12.)

Third, Huvis claims that the values Commerce selected to apply as facts available were

"so high that they must be characterized as 'adverse' under the antidumping law."  (*Id.*

at 31.)

The Government and Defendants-Intervenor defend Commerce's application of

facts available as consistent with statutory requirements and Commerce's prior practice,

and contend that the particular values selected as facts available are supported by

substantial evidence on the record.  (Def.'s Resp. to Pl.'s Mot. for J. upon the Admin. R.

("Def. Br.") 8-14; Defs.-Intervenor's Br. in Resp. to Huvis'[s] Mot. for J. on the Agency R.

("Defs.-Int. Br.") 23-35.)  This Court agrees with the Government and Defendants-

Intervenor that Commerce's use of facts available was consistent with statutory

requirements, and that the values Commerce applied as facts available were supported

by substantial evidence.  However, as explained below, this Court holds that

Commerce's application of facts available was not consistent with the agency's

established practice.  As a result, this Court grants Huvis's Motion for Judgment upon

the Agency Record, and remands the Final Results to Commerce for further action

consistent with this opinion.

## I.    Application of Facts Available in Accordance with Statute

Section 1677e of title 19, U.S. Code, governs the use of facts available.  Section

1677e provides that if "necessary information is not available on the record" Commerce

"shall, subject to section 1677m(d) of this title, use the facts otherwise available in

reaching the applicable determination under this subtitle."  19 U.S.C. § 1677e(a) (2000).

To determine what information is necessary for Commerce to make its determination,

this Court looks to the applicable substantive statutory provision, the Major Input Rule,

19 U.S.C. § 1677b(f)(2) and (3) (2000).  As mentioned above, *supra*, footnote 2, the CAFC

has affirmed that Commerce, in applying the Major Input Rule, may select as the value

of a major input the highest of transfer price, market price, and cost of production.  *NTN*

*Bearing Corp. of Am.*, 368 F.3d at 1376.  Accordingly, in the underlying administrative

review, Commerce solicited from Huvis transfer price, market price, and cost of

production information for Huvis's major inputs of QTA, MTA, and PTA.

Huvis—with explanation, but nonetheless—failed to submit market price data

for the inputs QTA and PTA and there was therefore a gap in the record on this issue.

Commerce may apply facts available whenever there is a gap in the record.  *Id.* at 1377

("All that is required [to apply facts available] is that necessary information be

unavailable on the record.").  The CAFC explained that, in applying facts available:

> [t]he focus . . . is [on a] respondent's failure to provide information.  The
> reason for the failure is of no moment.  The mere failure of a respondent to
> furnish the requested information—for any reason—requires Commerce to
> resort to other sources of information to complete the factual record on
> which it makes its determination.

*Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1381 (Fed. Cir. 2003) (emphasis

omitted).  As a result, because there was a gap in the record on the issue of market price

for QTA and PTA, the statute gave Commerce the discretion to apply facts available

evidence to Huvis.

Huvis argues that "Commerce violated [19 U.S.C. § 1677m(e)] by declining to

consider . . . [the cost of production] evidence submitted by Huvis in this review,"

which Huvis argues "proved that Huvis's purchase prices [i.e., transfer prices] for the

inputs PTA and QTA were legitimate, arm's-length prices." (Pl. Br. 19.) Section

1677m(e) provides that Commerce

> shall not decline to consider information that is submitted by an interested
> party and is necessary to the determination . . . if
> > (1) the information is [timely] submitted . . .,
> > (2) the information can be verified,
> > (3) the information is not so incomplete that it cannot serve as a
> > reliable basis for reaching the applicable determination,
> > (4) the interested party has demonstrated that it acted to the best of
> > its ability in providing the information . . . , and
> > (5) the information can be used without undue difficulties.

19 U.S.C. § 1677m(e) (2000). Yet, Commerce did not decline to consider Huvis's

submitted cost of production data. On the contrary, Commerce accepted the cost of

production data and relied on it to calculate proxy market prices for QTA and PTA.

(*See* 5AR Issues and Decision Mem., Comment 1, Pub. Doc. 80)(Commerce "calculated

the supplier's profit rate from the supplier's [fiscal year ending] 2004 financial

statements, and added the amount for profit to the supplier's [cost of production] to

arrive at a market value.") Undoubtedly, Huvis would have preferred Commerce to

verify the arm's-length nature of the QTA and PTA transfer prices with cost of

production data alone. However, Commerce's decision to fill in proxy market prices for

those inputs, and compare all three values, does not constitute rejection of the cost of

production data.  As a result, Commerce's application of facts available was not

inconsistent with 19 U.S.C. § 1677m(e).

## II.    <u>Facts Available Applied to Huvis Were Supported by Substantial Evidence</u>

Huvis also claims that the facts available market prices for QTA and PTA were

"so high that they must be characterized as 'adverse' under the antidumping law."  (Pl.

Br. 31.)  Huvis argues that Commerce did not establish that the company failed to

cooperate, a prerequisite for applying adverse facts available to a respondent, and

therefore, that the use of "adverse" facts available was not supported by substantial

evidence on the record or otherwise in accordance with law.  (*Id.*)  Huvis is correct that

before Commerce may apply adverse facts available to a respondent, it must find that

the respondent "failed to cooperate by not acting to the best of its ability to comply with

a request for information from [Commerce]."  19 U.S.C. § 1677e(b).  However, Huvis

cites no statute, regulation, or case law for its claim that the facts available Commerce

applied to Huvis were effectively "adverse."

All the statute requires in applying facts available is that Commerce select

"information . . . which is reasonable to use under the circumstances."  Statement of

Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Rep.

No. 103-316, at 869-70 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4198.  Here,

Commerce calculated the facts available market prices for QTA and PTA from two

verified sources, contemporaneous to the period of review: the supplier Samnam's

Fiscal Year End 2004 financial statements, and Samnam's cost of production data from

the period of review.  Further, the methodology Commerce employed, adding together

the supplier's cost of production and the supplier's reported profit level, is consistent

with statutory instructions regarding calculation of constructed value.  *See* 19 U.S.C.

§ 1677b(e) (constructed value calculated by adding together the cost of inputs, selling,

general, and administrative expenses, and an amount for profits).  While the

constructed value provision is not directly applicable to the issue at hand, it is

instructive on the question of the reasonableness of Commerce's methodological choice.

The reasonableness of the methodology coupled with the verified data used establishes

that the market price data Commerce selected as facts available are not unsupported by

substantial evidence on the record.

III.    **Application of Facts Available Not in Accordance with Commerce's Practice**

        While Commerce may have the *statutory* discretion to apply facts available to a

respondent like Huvis, that discretion can be curbed in the face of a consistent contrary

agency *practice*.  *See INS v. Yang*, 519 U.S. 26, 32 (1996) ("Though the agency's discretion

is unfettered at the outset, if it announces and follows—by rule or by settled course of

adjudication—a general policy by which its exercise of discretion will be governed, an

irrational departure from that policy . . .  could constitute action that must be

overturned as 'arbitrary, capricious, [or] an abuse of discretion . . . ."). Huvis contends

that "Commerce's consistent prior practice, both in this proceeding and in other cases,

has been to test the arm's-length nature of a transfer price for a major input based on

market price or [cost of production] alone when only one of those variables was

available." (Pl. Br. 11.) This Court must address two questions: (A) Does Commerce

have an established practice of testing the arm's-length nature of a transfer price for a

major input with market price or cost of production alone, when only one of those

values is available?; and (B) If so, did Commerce adequately justify its departure from

the established practice?

### A.    Commerce's Practice

This Court first addresses whether Commerce has an established practice of

testing the arm's-length nature of a transfer price for a major input with market price or

cost of production alone, when only one of those values is available. Huvis points out

that in the second, third, and fourth administrative reviews of the antidumping duty

order on PSF from Korea, as well as in the preliminary results of the fifth administrative

review, Commerce verified transfer price with cost of production data alone for some of

Huvis's major inputs. Huvis also cites to other antidumping proceedings where Huvis

argues Commerce did the same thing.[4]

---

[4]Commerce cites to *Carbon and Certain Alloy Steel Wire Rod from Mexico*, 67 Fed.
(continued...)

In contrast, the Government and Defendants-Intervenor insist that Commerce

does not have such a consistent practice, either in the proceedings involving Huvis or

otherwise.  With respect to the proceedings involving Huvis, the Government contends

that Commerce "has used four different methodologies for valuing major inputs over

the course of the investigation and five administrative reviews."  (Def. Br. 11.)

Defendants-Intervenor similarly argue that Commerce does not have a consistent

practice with respect to Huvis: "In the second and third [administrative] reviews, the

Department compared *all three* elements of the major input rule for Huvis'[s] purchases

of MTA from SK Chemicals, but only relied on *two of the three* elements . . . for Huvis'[s]

purchases of QTA and PTA from Samnam (the transfer price and the affiliate's cost of

production)."  (Defs.-Int. Br. 18.)

The Government and Defendants-Intervenor essentially argue that in applying

the Major Input Rule, Commerce did not *always* test Huvis's transfer prices with cost of

production data alone.  However, they misinterpret the relevant universe of facts.

_____

[4](...continued)
Reg. 55,800 (Dep't Commerce Aug. 30, 2002) (final determination), *Certain Corrosion-Resistant Carbon Steel Flat Products and Certain Cut-to-Length Carbon Steel Plate from Canada*, 62 Fed. Reg. 18,448, 18456 (Dep't Commerce Apr. 15, 1997) (final review results), and *Certain Corrosion-Resistant Carbon Steel Flat Products from Korea*, 71 Fed. Reg. 53,370, 53,375 (Dep't Commerce Sept. 11, 2006) as examples of "Commerce's consistent practice" of "test[ing] the arm's length nature of an input's transfer price based on market price or [cost of production] alone when only one of these values was available on the record of the proceeding."  (Pl. Br. 13, 14-15.)

Huvis does not claim that in *every* application of the Major Input Rule to the company,

Commerce has required only market price or cost of production data.  Rather, Huvis

claims that, when only market price or cost of production data was available, but not

both, Commerce has verified the transfer price with whichever measure was available.

This is correct.

　　　In each of the three prior administrative reviews, Huvis failed to submit market

price data for its major inputs QTA and PTA.  If this Court describes each comparison of

transfer price, market price, and cost of production for each input as a separate instance,

Commerce accepted cost of production data alone to verify the arm's-length nature of

transfer prices in *five* out of *six* instances (for both inputs in the second and third

administrative reviews, while only for PTA in the fourth administrative review).[5]  In the

---------------------------------------------------

　　　[5]In the final results of the antidumping duty investigation, Commerce followed a
similar course where the respondent Samyang (one of Huvis's parent companies)
submitted transfer price and market price, but not cost of production, for its purchases
of QTA and PTA.  Because Commerce "determined that Samyang did, to the best of its
ability, attempt to obtain the affiliates' [cost of production] data" the agency "valued
PTA and QTA based on the higher of the transfer price or the market price for each
input."  *Issues and Decision Mem. for the Final Determination in the Antidumping Duty
Investigation of Certain PSF from the Republic of Korea*, Comment 6 (Mar. 22, 2000), *available
at* http://ia.ita.doc.gov/frn/ (last visited November 10, 2007).

　　　It is not lost on this Court that the company Huvis now claims is unwilling to
release market price data for the inputs QTA and PTA, Samnam, is the same company
willing to give Samyang—one of Huvis's parent companies—market price data for the
same inputs (but not cost of production data!).  However, if Commerce is suspicious of
Huvis's avowed inability to obtain market price data from Samnam, the agency must
directly address this in its results.  Commerce is not free to treat Huvis differently than

(continued...)

one counterexample, Commerce explained that there was record evidence suggesting

that QTA and MTA were interchangeable, and, therefore, filled in the missing QTA

market price with Huvis's submitted MTA market price.  Further, in the preliminary

results of the instant administrative review, Commerce continued to test the arm's-

length nature of the transfer price for PTA by comparing it to the affiliated supplier's

cost of production alone.

"An action . . . becomes an 'agency practice' when a uniform and established

procedure exists that would lead a party, in the absence of notification of a change,

reasonably to expect adherence to the [particular action] or procedure."

*Ranchers–Cattlemen Action Legal Found. v. United States*, 23 CIT 861, 884-85, 74 F. Supp. 2d

1353, 1374 (1999).  At one end of the spectrum, the court has held that "two prior

determinations [in separate administrative proceedings] are not enough to constitute an

agency practice that is binding on Commerce."  *Shandong Huarong Machinery Co., Ltd. v.

United States*, 30 CIT __, __, 435 F. Supp. 2d 1261, 1282 n.23 (2006).  On the other hand,

the court has held that a methodology used in five consecutive segments of an

antidumping proceeding became the law of the proceeding, from which Commerce

---

[5](...continued)
it has in past administrative reviews without justification.  *See Hussey Copper, Ltd. v.
United States*, 17 CIT 993, 997, 834 F. Supp. 413, 418 (1993) ("It is a general rule that an
agency must either conform itself to its prior decisions or explain the reasons for its
departure.") (internal quotation and citation omitted).

could not depart. *Shikoku Chems. Corp. v. United States*, 16 CIT 382, 388, 795 F. Supp. 417,

422 (1992).

Commerce's actions here are more analogous to those in *Shikoku Chemicals*, 16

CIT 382, 795 F. Supp. 417, than those in *Shandong Huarong Machinery*, 30 CIT __, 435 F.

Supp. 2d 1261. While Commerce has not *exclusively* accepted cost of production data

alone to test transfer price, the history of the prior administrative reviews here

establishes that Commerce has repeatedly and regularly done so, and Huvis could

"reasonably . . . expect adherence to the" particular agency action. *Ranchers–Cattlemen*

*Action Legal Found.*, 23 CIT at 885, 74 F. Supp. 2d at 1374. As a result, this Court finds

that Commerce established a practice with its repeated acceptance of cost of production

data alone to verify Huvis's transfer prices of major inputs when market price data was

not available.[6]

Defendants-Intervenor cite *SKF USA Inc. v. United States*, 24 CIT 822, 116 F. Supp.

2d 1257 (2000), for the proposition that Commerce "has the discretion to determine how

it will apply the major input rule in a particular review and from review-to-review."

---

[6]Because this Court has already determined that, within Huvis's administrative
proceeding, Commerce tested the arm's-length nature of transfer price with cost of
production or market price data alone when only one of those values was available, this
Court need not address Huvis's allegations that Commerce also did so in other
proceedings (Pl. Br. 11). *See Shikoku Chems. Corp.*, 16 CIT at 388, 795 F. Supp. at 422
(practice established by Commerce's actions within the plaintiff's proceeding).

(Defs.-Int. Br. 19; *see also* Def. Br. 9.)  In *SKF*, the plaintiff failed to report the market

price of a major input in the form and manner requested by Commerce, and, therefore,

Commerce was unable to verify the market price.  As a result, Commerce applied

partial facts available to fill in the gaps for the missing market price information.  In the

face of the plaintiff's argument that applying facts available for the missing market price

data was contrary to the agency's practice in prior administrative reviews, the court

held:

> Commerce properly determined that it had discretionary authority to use
> the highest of transfer price, market price or [cost of production] in
> valuing SKF's reported major inputs. . . .   Moreover, the fact that
> Commerce may not have applied the provisions in prior . . . reviews, does
> not make Commerce's exercise of discretion to apply them in this review
> unreasonable.

*SKF*, 24 CIT at 834, 116 F. Supp. 2d at 1267.

Yet, *SKF* is distinguishable from the case at bar for two reasons.  First, this was

not a case where the plaintiff represented to Commerce that it was not able to report

market price data because the company did not possess it.  Rather, SKF had the market

price data, but did not submit it in a form and manner that Commerce could use.  On

that ground alone, SKF is significantly different from Huvis.  Furthermore, Commerce's

actions in SKF were not contrary to an established agency practice, as is the case here.

Consequently, *SKF* does not inform on this issue.

**B.      Commerce's Explanation for Departing from its Established Practice**

The second question for this Court is whether, in the Final Results, Commerce

adequately justified the departure from its established practice.  "When an agency

decides to change course . . . it must adequately explain the reason for a reversal of

policy."  *Nippon Steel Corp. v. U. S. Int'l Trade Comm'n*, 494 F.3d 1371, 1378 n.5 (Fed. Cir.

2007); *see also Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Ins. Co.*,

463 U.S. 29, 57 (1983) ("an agency changing its course must supply a reasoned analysis")

(internal quotation and citation omitted).  The Government and Defendants-Intervenor

contend that Commerce satisfied this burden by giving Huvis notice in the fourth

administrative review that the agency would now require both cost of production and

market price to test the arm's-length nature of transfer price.  (Def. Br. 12; Defs.-Int. Br.

18.)

In the fourth administrative review, Commerce substituted-in MTA market price

data for the missing QTA market price data.  The Government and Defendants-

Intervenor argue that, through this action, Commerce notified Huvis that cost of

production data alone would no longer be sufficient to verify transfer price.  Yet, in that

very administrative review, Commerce continued to test the arm's-length nature of the

PTA transfer price with cost of production data alone.  Further, Commerce again

accepted only cost of production data to verify the transfer price of PTA in the

preliminary results of the fifth administrative review.  Therefore, Commerce's assertion

that it gave notice to Huvis that cost of production data alone would no longer suffice is

not supported by substantial evidence on the record.

Furthermore, Commerce is required to explain *why* it is changing course, not

merely *that* it is changing course.  *See Nippon Steel Corp.*, 494 F.3d at 1378 n.5.

"Commerce has the flexibility to change its position providing that it explains the basis

for change and providing that the explanation is in accordance with law and supported

by substantial evidence."  *Cultivos Miramonte, S.A. v. United States*, 21 CIT 1059, 1064,

980 F. Supp. 2d 1268, 1274 (1997).  Here, Commerce's proffered explanation for its

change in practice with respect to Huvis falls short of the mark.

Commerce first tries to distinguish its treatment of Huvis in the Final Results

from antidumping proceedings covering other merchandise.  Commerce states that

"unlike *Steel Wire Rod from Mexico*[, Fed. Reg. 67 Fed. Reg. 55,800,] and *Certain Carbon*

*Products from Canada*, [62 Fed. Reg. 18,448,] the facts on the record in this case

demonstrate that market prices do exist for the inputs at issue: Huvis stated that its

supplier makes sales to unaffiliated customers."  (5AR Issues and Decision Mem.,

Comment 1, Pub. Doc. 80.)

There are two problems with this justification.  First, it is incorrect.  In the above-

cited administrative proceedings, the relevant fact was not that there was no market

price data *in existence*, but rather that market price data was not *on the record*. *See Issues*

*and Decision Mem. for the Final Determination of the Antidumping Duty Investigation:*

*Carbon and Certain Alloy Steel Wire Rod from Mexico,* at 30, *available at*

http://ia.ita.doc.gov/frn/ (last visited Nov. 10, 2007) ("In past cases where a comparable

market price for an input purchased from an unaffiliated supplier was *unavailable*, the

Department has accepted the actual [cost of production] incurred by the related

supplier as a surrogate." (emphasis added)); *Certain Corrosion-Resistant Carbon Steel Flat*

*Products and Certain Cut-to-Length Carbon Steel Plate from Canada*, 62 Fed. Reg. 18,448,

18,456 (Dep't Commerce Apr. 15, 1997) ("There is no market price *on the record* for this

input. Therefore, the Department's analysis was focused on the transfer prices and cost

of production." (emphasis added)). The second, and more fundamental, shortcoming is

that the reasoning does not explain the disparate treatment of Huvis in the Final Results

as compared to its treatment in the second, third, fourth, and preliminary results of the

fifth administrative review, when market price data for QTA and PTA existed, but was

not on the record.

Commerce's other purported explanation also falls short. Commerce says that it

stopped accepting cost of production data alone to verify transfer price because "the

second administrative review involved a shift from comparing an average [terepthalic

acid] market price to evaluating each form of [terepthalic acid] separately." (5AR Issues

and Decision Mem., Comment 1 , Pub. Doc. 80.)  Yet, Commerce's change in practice

occurred in the fifth, not the second, administrative review.  If the change in

methodology necessitated the change in Commerce's practice, one would expect the

change in practice to coincide with the change in methodology, not to lag the change by

three years.  Moreover, Commerce failed to explain why the shift from comparing an

average terepthalic acid market price to evaluating each form of terepthalic acid

separately necessitates the change in practice.  *See State Farm*, 463 U.S. at 43 (explanation

needs "a 'rational connection between the facts found and the choice made.'" (*quoting*

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

Because the reasons Commerce gave for its change in practice with respect to

Huvis are not supported by substantial evidence, Commerce's change is arbitrary.

*Cultivos Miramonte S.A.*, 21 CIT at 1064 n.7 ("A change is arbitrary if the factual findings

underlying the reason for change are not supported by substantial evidence."); *see also*

*SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) ("[A]n agency action is

arbitrary when the agency offers insufficient reasons for treating similar situations

differently.") (internal quotation and citation omitted).  As a result, the Final Results are

not in accordance with law.  Therefore, this Court will remand the Final Results to

Commerce to either (1) test the arm's-length nature of Huvis's major inputs of QTA and

PTA with cost of production data alone, or (2) adequately explain the reason for treating

Huvis differently in this administrative review than the agency has in prior

administrative reviews.


CONCLUSION

Because the Final Results are inconsistent with Commerce's established practice,

and Commerce failed to adequately explain why it departed from its established

practice in this instance, the Final Results are not in accordance with law.  As a result,

this Court grants Huvis's USCIT R. 56.1 Motion for Judgment upon the Agency Record

and remands the Final Results to Commerce for further action consistent with this

Opinion and Order.

Upon consideration of the papers filed by the parties, and upon due deliberation,

it is hereby

**ORDERED** that Plaintiff's Motion for Oral Argument is denied; it is further

**ORDERED** that Plaintiff's Motion for Judgment upon the Agency Record is
granted; it is further

**ORDERED** that the Final Results are remanded to Commerce to either (1) test
the arm's-length nature of Huvis's major inputs of QTA and PTA with cost of
production data alone, or (2) adequately explain the reason for treating Huvis
differently in this administrative review than the agency has in prior administrative
reviews; it is further

**ORDERED** that the remand results shall be filed no later than February 11, 2008;
it is further

**ORDERED** that Huvis may file papers with this Court indicating whether they are satisfied with the remand results no later than March 17, 2008; that the Government and Defendants-Intervenor may file responses to Huvis's comments no later than April 11, 2008.

**SO ORDERED.**


___/s/_Gregory_W._Carman_____
Gregory W. Carman

Dated: November 20, 2007
    New York, N.Y.

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____      By: _____

Deputy Clerk